RENDERED: APRIL 30, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000666-MR

STEVEN ZAPATA

APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE MITCH PERRY, JUDGE
NO. 13-CR-002075

COMMONWEALTH OF KENTUCKY

APPELLEE

## OPINION OF THE COURT BY JUSTICE WRIGHT

### AFFIRMING

A Jefferson County Grand Jury indicted Steven Zapata for one count of murder for killing his wife, Tondelia. On October 28, 2015, Zapata entered a guilty plea pursuant to *North Carolina v. Alford*, 91 S. Ct. 160 (1970), in which he maintained his innocence while acknowledging the Commonwealth had sufficient evidence to convict him. On November 5, Zapata's court-appointed counsel filed a motion to withdraw his guilty plea. On November 9, Zapata mailed his own motion to withdraw the plea, alleging deficiencies in representation. The trial court denied both motions and Zapata appealed. In *Zapata v. Commonwealth*, 516 S.W.3d 799 (Ky. 2017), this Court vacated the judgment and order denying Zapata's motion to withdraw the guilty plea and remanded the case for further proceedings.

On remand, the trial court permitted Zapata's newly-appointed conflict counsel time to consult with Zapata, review prior counsel's litigation file, and determine if Zapata wished to continue with his guilty plea or proceed with a new motion to withdraw the plea. Zapata's new counsel filed a motion to withdraw the guilty plea.

The trial court conducted an evidentiary hearing on the new motion to withdraw the guilty plea. Zapata and his previous counsel, Angela Elleman, testified at the hearing. After additional briefing, the trial court denied Zapata's motion to withdraw his guilty plea. The trial court sentenced Zapata to 24 years' imprisonment in accordance with the plea agreement. He now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

Zapata raises two main issues on appeal: 1) the trial court erred by not permitting him to withdraw his guilty plea (due to (a) ineffective assistance of counsel, (b) Elleman's disqualifying conflict of interest, and (c) "Zapata's incorrect belief of his absolute right to withdraw his guilty plea at any time prior to sentencing") and 2) even assuming the plea was voluntarily entered, the trial court abused its discretion when it denied his motion to withdraw his guilty plea. After careful review, we affirm the trial court.

## I. BACKGROUND

Zapata and his wife, Tondelia, had been married for three months when she was found strangled to death in the couple's shared apartment. In statements to police, Zapata claimed Tondelia attacked him with a knife. Zapata claimed that, in response to Tondelia's attack, he punched her multiple

2

times and had his hands around her throat. According to Zapata, Tondelia was alive when he left the apartment. Zapata was indicted for her murder.

Zapata was examined for competency to stand trial by the Kentucky Correctional Psychiatric Center (KCPC) and by his court-appointed defense counsel's retained expert. Following a hearing, the trial court determined Zapata was competent. After that ruling by the trial court, Zapata filed a motion to represent himself as hybrid counsel. The trial court conducted a hearing pursuant to *Faretta v. California*, 95 S. Ct. 2525 (1975),[1] and permitted Zapata to act as hybrid counsel.

Zapata and the Commonwealth reached a negotiated plea agreement and appeared in court to enter the plea. On October 28, 2015, Elleman and Zapata negotiated a reduction in the agreed sentence recommendation for murder from 25 years to 24 years and Zapata entered an *Alford* plea. Paperwork filed in conjunction with the guilty plea included a "Motion to Enter Guilty Plea" form

---

[1] The United States Supreme Court set out the requirements for an accused to represent himself at trial in *Faretta*, 422 U.S. at 835. "In order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits . . . . Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.") (internal citations and quotation marks omitted).

Section 11 of the Kentucky Constitution also addresses this issue, stating: "[i]n all criminal prosecutions the accused has the right to be heard by himself and counsel . . . ." Our predecessor Court concluded this means "an accused may make a limited waiver of counsel, specifying the extent of services he desires, and he then is entitled to counsel whose duty will be confined to rendering the specified kind of services (within, of course, the normal scope of counsel services)." *Wake v. Barker*, 514 S.W.2d 692, 696 (Ky. 1974).

signed by Zapata with an unsigned "Certificate of Counsel." The trial court conducted a colloquy pursuant to *Boykin v. Alabama*, 395 U.S. 238 (1969), which requires trial judges to ensure guilty pleas are made intelligently, knowingly, and voluntarily. During the *Boykin* colloquy, the trial court questioned Zapata about the rights listed in the motion, but did not ask Elleman any questions about the certificate of counsel. The trial court accepted the plea and set the case for sentencing.

A few days later, Elleman filed a motion to withdraw Zapata's guilty plea with no reasons specified in support of the motion. Zapata filed his own motion to withdraw the guilty plea claiming (among other things) that he had been deceived by Elleman's incorrect advice that he could withdraw his guilty plea any time before sentencing, "no problem." According to Zapata, the deceit rendered his plea involuntary.

Despite Elleman's acknowledgment of the awkward position created by the allegations made by Zapata in the motion, the trial court did not appoint conflict counsel, noting that Zapata was acting as hybrid counsel. The trial court heard arguments, took no proof, and denied the motions to withdraw the plea. Zapata was sentenced pursuant to the terms of the plea agreement.

In Zapata's original appeal, this Court found an actual conflict existed between Zapata's interests and Elleman's interests over the motion to withdraw the guilty plea. The case was remanded, and the posture of the case was returned to the point in time when the plea had been accepted, but before the motion to withdraw the plea had been made. On remand, conflict counsel was

4

appointed, a new motion to withdraw the plea was filed, and the trial court denied the motion and sentenced Zapata according to the plea agreement.

## II. ANALYSIS

### A. The trial court did not err in denying Zapata's motion to withdraw his guilty plea due to ineffective assistance of counsel, counsel's alleged conflict of interest, or Zapata's incorrect belief that he could withdraw his guilty plea at any point prior to sentencing.

Zapata first argues that the trial court should have granted his motion to withdraw his guilty plea "in view of his former public defender's ineffectiveness in the plea negotiations and her disqualifying conflict of interest as well as Zapata's incorrect belief of his absolute right to withdraw his guilty plea at any time prior to sentencing." We will address each of these issues in turn.

### 1. *Ineffective assistance of counsel*

Zapata claims his counsel was ineffective during plea negotiations and that the trial court erred in denying his motion to withdraw his plea on these grounds. Zapata asserts that Elleman both essentially abandoned his representation during plea negotiations and told him that he could withdraw the plea agreement at any time before sentencing. He argues this essential abandonment of representation and incorrect advice amounted to ineffective assistance of counsel requiring the trial court to grant his motion to withdraw his plea.

At the outset, we note

> [u]nder either [RCr 8.10 or RCr 11.42], to be entitled to relief on that ground the movant must allege with particularity specific facts which, if true, would render the plea involuntary under the Fourteenth Amendment's Due Process Clause, would render the plea so tainted by counsel's ineffective assistance as to violate the

5

Sixth Amendment, or would otherwise clearly render the plea invalid.

*Commonwealth v. Pridham*, 394 S.W.3d 867, 874 (Ky. 2012): On appeal, "we review the trial court's factual findings only for clear error, but its application of legal standards and precedents . . . de novo." *Id.* "If the trial judge's findings of fact in the underlying action are not clearly erroneous, *i.e.*, are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion." *Commonwealth v. Deloney*, 20 S.W.3d 471, 473-74 (Ky. 2000). "Mere doubt as to the correctness of a finding would not justify reversal, and the appellate court does not consider and weigh evidence de novo. However, if a finding is without adequate evidentiary support . . . , the reviewing court may regard it as clearly erroneous." *Commonwealth v. Harrelson*, 14 S.W.3d 541, 548-49 (Ky. 2000).

Zapata's claims regarding his abandonment by counsel *repeatedly* return to the fact that Elleman had failed to sign the "Certificate of Counsel" located on page 2 of the "Motion to Enter Guilty Plea." The Certificate of Counsel on that form reads:

1. To the best of my knowledge and belief, the defendant understands the allegations contained in the indictment and/or any amendments thereto. I have fully discussed with the defendant the charges and any possible defenses to them and I believe that he/she fully understands the charges and possible defenses. I have reviewed with the defendant the attached "Commonwealth's Offer on a Plea of Guilty" and the Foregoing "Motion to Enter a Plea of Guilty," and I believe he/she understands these documents.

6

2. To the best of my knowledge and belief, his/her plea of **"GUILTY"** is made freely, knowingly, intelligently and voluntarily. I have fully explained the defendant's constitutional rights to him/her and I believe that he/she understands them.

3. The plea of **"GUILTY"** as offered by the defendant is consistent with my advice to him/her, and I recommend to the Court that his/her plea be accepted.

The reasons for Elleman's failure to sign the form were extensively explored during the evidentiary hearing. According to Elleman, she did not sign the certificate because she disagreed with the trial court's ruling that Zapata was competent to stand trial following his examination at the Kentucky Correctional Psychiatric Center (KCPC). Zapata raises no issues in this appeal concerning that competency ruling. However, according to Elleman, Zapata's competency remained an issue for her—even after the trial court had ruled otherwise. At the plea withdrawal hearing on remand, Elleman said, "I didn't sign [the certificate] because my personal opinion was that Mr. Zapata wasn't competent."

Zapata's conflict counsel asked Elleman if her failure to sign the certificate was because everything listed in the certificate was not true including that the plea was voluntarily entered. Elleman responded that her concerns over Zapata's competency extended over the entire guilty plea. After reviewing the plea colloquy transcript, Elleman acknowledged the trial court did not ask any questions about the certification during the *Boykin* hearing on the plea and Elleman did not inform the court of her concerns.

Zapata argues that, "[a] signed and dated *Certificate of Counsel* is a requirement for a defendant entering a guilty plea." He insists that Elleman's failure to sign the form is indicative of the fact that she had abandoned her client during the plea negotiations and he was unrepresented at that stage of trial. He refers to no rule of procedure, rule of evidence, or case authority that requires counsel's signature on this form before a guilty plea may be accepted. Under the facts and circumstances of this case, we decline to hold either that a signed certificate was a requirement for the entry of Zapata's guilty plea or that it indicates Elleman abandoned her client.

Zapata goes so far as to allege that "[t]he failure of a trial judge to elicit this information [contained on the form] from counsel via either the form or questioning *renders the plea involuntary . . . ."* (emphasis added.) Again, Zapata directs us to no legal authority making such a signature or inquiry by the trial court mandatory for a finding of voluntariness. We decline to adopt such a position today.

The trial court determined the guilty plea was voluntary based on the totality of circumstances present in this case. In its order, the trial court stated:

> Trial courts are in a unique position when it comes to the observation of criminal defendants. Over the course of a case, from indictment to final judgment or acquittal, a Court observes how defendants interact with their attorneys, how they participate in their own defense, and their bearing in listening and responding to the Court. In the case of Steven Zapata, this Court had the occasion to observe him on no fewer than twenty occasions. During the two and a half year pendency of Zapata's case, this Court observed on multiple occasions that Zapata was as savvy, smart, and sophisticated as any Defendant who has appeared

8

before this Court. Nothing that was raised at the evidentiary hearing concerning Zapata's motion to withdraw his guilty plea changed those observations.

Zapata, in his capacity as defendant and hybrid counsel, participated meaningfully in his own defense. He communicated on numerous occasions with this Court, demonstrating an understanding of the processes and procedures which took place, and in fact meaningfully participating in them. At each conference between Zapata's election to represent himself in a hybrid counsel situation and his final guilty plea, Zapata reaffirmed his desire to continue representing himself in conjunction with Elleman. Zapata offered spirited arguments in his own defense, both to this Court and apparently in negotiations with the Commonwealth's Attorney. In fact, on the day of the scheduled plea hearing and with the assistance of Elleman, he successfully negotiated a further one (1) year reduction in total sentence.

Included in the more than twenty court appearances noted in the trial court order, a review of the record discloses that two appearances were competency hearings, one was a *Faretta* hearing, and one a *Boykin* plea colloquy. The trial court observed Zapata when he testified at the hearing on the motion to withdraw his plea. There were significant interactions between Zapata, his attorneys, the Commonwealth, and the trial court in a variety of hearings. Zapata's involvement in these hearings contrasts with more limited events such as an arraignment, where "yes or no" answers or "state your full name" are the more typical interactions between a trial court and a defendant.

The opportunities this trial court had to observe Zapata and draw conclusions from those observations, support the trial court's findings. A signed certificate of counsel would have been evidence of the voluntariness of the plea (as it would have provided Elleman's *opinion* that Zapata voluntarily entered his plea), but the absence of the signed certificate is *not* proof that the

plea was involuntary. A failure to sign or testify is an absence of proof rather than proof of anything.

As this case demonstrates, the better practice is for trial courts to review both motions to enter guilty pleas and certificates of counsel with a defendant's counsel during the plea colloquy. Any issues or concerns that counsel has can be resolved, and a clear record established. In this case, for whatever reason, the trial court did not ask counsel questions about the certificate of counsel. While that did not, in and of itself, render this plea invalid, the better practice for all concerned in future cases is for the trial court to take the time to ask counsel questions about the plea and the documents filed in conjunction therewith.

We also consider the actual words Zapata spoke in the *Boykin* plea colloquy. "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 97 S. Ct. 1621, 1629 (1977). However, we do not view those declarations in isolation. "In other words, the validity of a guilty plea is determined not by reference to some magic incantation recited at the time it is taken but from the totality of the circumstances surrounding it." *Kotas v. Commonwealth*, 565 S.W.2d 445, 447 (Ky. 1978) (citing *Brady v. United States*, 90 S. Ct. 1463 (1970)). We have directed trial courts:

> In cases where the defendant disputes his or her voluntariness, a proper exercise of this discretion requires trial courts to consider the totality of the circumstances surrounding the guilty plea and juxtapose the presumption of voluntariness inherent in a proper plea colloquy with a *Strickland v. Washington* [,104 S. Ct. 2052 (1984),] inquiry into the performance of counsel.

10

*Bronk v. Commonwealth*, 58 S.W.3d 482, 486 (Ky. 2001) (footnotes omitted).

In applying *Strickland* to plea agreements, we have quoted the Court of Appeals' statement that:

> "A showing that counsel's assistance was ineffective in enabling a defendant to intelligently weigh his legal alternatives in deciding to plead guilty has two components: (1) that counsel made errors so serious that counsel's performance fell outside the wide range of professionally competent assistance; and (2) that the deficient performance so seriously affected the outcome of the plea process that, but for the errors of counsel, there is a reasonable probability that the defendant would not have pleaded guilty, but would have insisted on going to trial."

*Bronk*, 58 S.W.3d at 486 (quoting *Sparks v. Commonwealth*, 721 S.W.2d 726, 727–28 (Ky. App. 1986)).

Zapata argues the trial court limited his ability to inquire about ineffective assistance of counsel issues during the hearing on the new motion. The record reveals the trial court (on one occasion) did tell Zapata's counsel that the hearing was not being held to rule on a general ineffective assistance of counsel motion. Instead, the trial court directed counsel to focus on those issues connected to the guilty plea and the motion to withdraw the guilty plea. Specifically, the trial judge stated, "[t]here is no RCr 11.42 motion on the table." In response, Zapata's counsel argued vigorously that ineffective assistance was an issue involved in the motion to withdraw the guilty plea. We note the trial court did not prevent counsel during the remainder of the hearing from asking questions about ineffective assistance of counsel as it related to the guilty plea or the motion to withdraw the plea. After asking counsel to take a deep breath and calm down, the trial court directed him to proceed. The trial

11

judge concluded by saying "[a]sk *whatever question* you are curious about to Ms. Elleman." (emphasis added.) In telling Zapata's counsel to ask "whatever question" he wanted, the trial court lifted any limitation regarding questioning as to ineffective assistance of counsel.

Zapata asserts this single (and later revoked) limitation by the trial court affected his ability to present facts concerning ineffective assistance of counsel through testimony. As noted above, after a thorough search, we found no other trial court directives in the record that limited his questioning—nor does Zapata cite to any others. It appears the trial court initially intended to avoid a hearing on issues generally related to ineffective assistance of counsel and sought to keep the focus on the guilty plea and the motion to withdraw the guilty plea. As noted, the trial court withdrew that restriction and allowed Zapata's counsel to question Elleman. Following the exchange between Zapata's counsel and the trial judge, it would have been unreasonable for Zapata's counsel to believe he could not ask Elleman questions to support an ineffective assistance of counsel claim relating to the plea withdrawal.

In response to questions at the hearing, Elleman testified that Zapata expressed regrets about entering the plea when he called Elleman asking her to file a motion to set aside his plea. Regrets after entering a plea are not uncommon, especially when the plea bargain includes the recommendation for a substantial sentence (as was the case herein). However, regrets alone do not require that a trial court allow a defendant to withdraw his guilty plea.

12

As noted above, on the day he entered his guilty plea, Zapata asked the Commonwealth to reduce the sentencing recommendation by one year. Zapata also insisted on an *Alford* plea and the Commonwealth agreed. Elleman was successful in obtaining both the reduction in the sentencing recommendation and the *Alford* plea Zapata requested.

While the trial court did not use the words "ineffective assistance of counsel," it did effectively address Zapata's claim. The trial court summarized what Zapata was asking the trial court to do and clearly rejected that request:

> Essentially, Zapata's argument is that his court appointed attorney, Angela Elleman, misled him by advising him that he could withdraw his guilty plea at any time prior to final sentencing. And that further, she continued this deceit by lying under oath during evidentiary hearings in this case. For this Court to agree with Zapata's arguments, it is required to believe not only that Elleman misled Zapata regarding his ability to withdraw his plea, but that she also lied while under oath concerning that misleading advise. The Court simply does not believe those assertions about Elleman, and rejects Zapata's arguments in their entirety.

A review of the record reveals a substantial basis supporting the trial court's factual findings and, therefore, those findings are not clearly erroneous. Having accepted those factual findings, we note that the record supports the finding that Elleman continued to represent Zapata throughout the plea-negotiation process. Zapata had engaged the Commonwealth in plea negotiations in his dual role as defendant and hybrid counsel.

After this Court's remand for a plea-withdrawal hearing, Elleman testified that once the trial court found Zapata competent, she had a choice to assist Zapata in his plea or assist him at trial. Elleman said that Zapata indicated through his actions that he desired a plea agreement. She testified

13

the proposed plea was acceptable in light of the evidence she thought would be presented at trial. Elleman said, "I did not feel I had a viable defense that would result in a not guilty or a lesser charge, so that's why I recommended the guilty plea." Far from abandoning her client, Elleman assisted Zapata in making a reasonable choice under the circumstances. Elleman carried out Zapata's wishes to the extent possible and assisted him in reducing the agreed-upon offer by one year on the day the plea was entered. Elleman also obtained the *Alford* plea Zapata sought.

Furthermore, there is no reasonable possibility that but for the claimed ineffective assistance, Zapata would have chosen to go to trial and face higher penalties of 20 to 50 years or life imprisonment. A review of relevant facts shows why this is so. The cause of death in this case was strangulation—a slow and violent method of inflicting death. Zapata then fled from the scene and crossed state lines to avoid arrest. In Zapata's statements to the police, he admitted everything except that his wife was dead when he left the apartment. However, Zapata's version of events makes no logical sense. If it were true that Zapata's wife were alive when he left their apartment, then his wife would have most likely survived being choked. If someone is strangled and the pressure ceases prior to death, the victim will likely start breathing again unless the airway has been crushed. This would simply not have been a valid defense at trial. At sentencing, the jury would have also been privy to Zapata's extensive criminal history (comprising numerous out-of-state felony convictions, including one for aggravated rape).

14

Under the facts of this case, we hold that there was no ineffective assistance of counsel during plea negotiations, much less ineffective assistance so substantial that it impacted the plea process. Elleman did not "ma[k]e errors so serious that counsel's performance fell outside the wide range of professionally competent assistance." *Bronk*, 58 S.W.3d at 486 (internal quotations and citations omitted). But even assuming Elleman was ineffective in her representation of Zapata, her alleged "deficient performance [would not have] so seriously affected the outcome of the plea process that, but for the errors of counsel, there is a reasonable probability that the defendant would not have pleaded guilty, but would have insisted on going to trial." *Id.*

We affirm the trial court's factual findings related to Zapata's allegation of ineffective assistance, as they were not clearly erroneous. For the foregoing reasons, the trial court did not err in its refusal to allow Zapata to withdraw his plea on grounds that Elleman's assistance was ineffective.

### 2. *Conflict of Interest*

In Zapata's first appeal to this Court, we held "[t]here is no doubt an actual conflict existed in this case. Zapata's counsel was placed in the untenable position of defending her own interests which were adverse to her client[']s." *Zapata*, 516 S.W.3d at 803. The conflict we held existed in that case only extended to Zapata's plea-withdrawal hearing, in which he had made allegations of deficiencies in Elleman's representation. In the present appeal, Zapata asserts that the conflict of interest existed even before the plea was entered, thus rendering his plea involuntary.

15

Zapata argues on appeal that: "Ms. Elleman's total disagreement with Zapata's election to proceed to trial as a hybrid defense team was for her a conflict of interest that undermines the voluntariness of Zapata's guilty plea." Zapata further states that even zealous advocates may be unaware of a debilitating conflict of interest.

During the *Faretta* hearing at which the trial court decided Zapata could act as hybrid counsel, Elleman stated that she was concerned with the possibility that Zapata may ask improper and unethical questions—or want her to ask such questions. Elleman testified that Zapata "had very strong beliefs that witnesses should be asked questions that were not admissible or relevant." For example, Elleman was concerned that Zapata's delusions about her working for the FBI and tampering with evidence could give rise to improper questions. Elleman was concerned that Zapata would ask questions he thought he had a basis to ask, but in reality, no basis existed. She feared such potential improper questions could undermine Zapata's position with the jury.

Elleman described her concern about Zapata asking or expecting her to ask witnesses improper questions as "much of the conflict going forward." Zapata now says that her words concerning a "conflict" were indicative of a conflict of interest that denied Zapata adequate representation. We disagree. Given the context of her statement, Elleman was clearly referring to the "conflict" between her ethical responsibilities as an attorney and unethical

questions Zapata, acting as hybrid counsel, may expect her to ask. This is not the type of disqualifying conflict our precedent recognizes.

While we acknowledge that it was a case about a conflict of interest arising from an attorney's former representation of a client, we find guidance in the standard regarding disqualifying conflicts of interest set out in *Marcum v. Scorsone*, 457 S.W.3d 710 (Ky. 2015). There, we overruled prior precedent requiring an attorney be disqualified for the mere appearance of impropriety. Instead, we set out a new standard, to wit: "[b]efore a lawyer is disqualified ..., the complaining party should be required to show an actual conflict, not just a vague and possibly deceiving appearance of impropriety." In the case at bar, Zapata can show no such actual conflict.

Elleman testified that: "When you co-counsel with a client, there are inherent difficulties with that relationship." Among these difficulties, Elleman pointed to differing views about the strength of the case and overall strategies that were in Zapata's best interest. We note that Elleman spoke with Zapata on numerous occasions after the trial court granted his motion to act as hybrid counsel.

Elleman voiced no concerns at the hearing that Zapata's delusions interfered with their discussions about which witnesses the defense would call, which witnesses Elleman would cross examine or question on direct examination, or Zapata's decision about whether to testify. In summary, Elleman testified that although Zapata kept putting off making firm and final decisions about trial roles for each of them, she did not indicate problems so

17

severe they endangered the attorney-client relationship or created an actual conflict disqualifying her from representing her client. Elleman said she thought the issue of Zapata's competency would have to be revisited "somewhere down the road."

"An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172, n5 (2002). In that same vein, this Court has stated:

> where the alleged conflict is raised at some later point during post-conviction proceedings, the standard set forth in *Cuyler v. Sullivan*, 446 U.S. 335, . . . (1980), controls. . . . That more stringent standard requires the defendant to demonstrate both that a conflict existed and that it prejudiced him—i.e., that it adversely affected his counsel's performance—in some cognizable way. *Id.*

*Samuels v. Commonwealth*, 512 S.W.3d 709, 712-13 (Ky. 2017).

A review of the record does not support a claim that an actual conflict existed, and much less that counsel's performance was adversely affected by any purported conflict.

Disagreements between an attorney and her client over what questions to ask witnesses, trial strategy, and strengths of a client's case are a familiar part of the trial landscape. Those disagreements occur regardless of whether a client has delusions or whether the client is acting as hybrid counsel. Nothing in the record supports that communication was broken down between Elleman and Zapata evincing some actual conflict affecting Elleman's representation of her client. As noted above, after the trial court allowed Zapata to proceed as hybrid counsel, visits, phone calls, and letters continued between Elleman and Zapata.

18

Elleman testified that because Zapata kept putting off final decisions about how trial responsibilities were going to be divided, she was preparing as if she were going to handle the entire trial. Elleman's decision to prepare for an entire trial was a prudent course of action absent a written agreement dividing trial responsibilities. The trial court required that a document listing the separate trial responsibilities for Zapata and Elleman be filed in the record, but when Zapata entered the guilty plea, the trial court had yet to set a final deadline for that document. Without a final agreement reduced to writing, it was entirely possible that Zapata might decide at the last minute he would not handle anything at trial, or perhaps that he would handle only a minimal amount. It was equally possible Zapata might decide to handle most of the trial, or even all of it. Elleman was obligated to be prepared for whatever eventuality might occur. Her trial preparation does not show any evidence of a disqualifying actual conflict.

A conflict of interest occurs when an attorney's interests are at odds with her client's interests. In Zapata's previous appeal, this Court held that the trial court should have appointed conflict counsel at the hearing on Zapata's motion to withdraw his guilty plea, as Zapata alleged Elleman had provided incorrect legal advice on which he based his decision to plead guilty. That is the kind of actual conflict of interest that would disqualify an attorney from representing her client. However, Elleman's concerns over possible improper questioning of witnesses by Zapata, her disagreement with Zapata acting as hybrid counsel, and her disagreement with the trial court finding Zapata competent did not rise

19

to the necessary level of an actual conflict so as to require Elleman's disqualification from representing Zapata.

Lawyers routinely disagree with the decisions of their clients and the decisions of trial courts. These disagreements are everyday realities of practicing law. Despite these disagreements, lawyers are charged with protecting their client's interests. Were we to hold that the simple disagreement here created a conflict, lawyers would have to withdraw or seek conflict counsel every time they disagreed with a client's decision. That is not a reasonable or practical approach to the administration of justice—and not the sort of disqualifying actual conflict envisioned by our precedent.

Elleman assisted Zapata in entering the plea bargain. Zapata, through Elleman, improved the agreement to his benefit on the day he entered the plea. Zapata (again through Elleman) convinced the Commonwealth to agree he could proceed with an *Alford* plea. There was no actual conflict of interest that exhibited an adverse effect on counsel's performance and no prejudice to Zapata. The trial court did not err in denying Zapata's motion to withdraw his plea on grounds of Elleman's alleged conflict of interest.

### 3. *Zapata's incorrect belief that he could withdraw his plea at any time*

Zapata next argues that the trial court and Elleman both failed to correct his mistaken belief that he could withdraw his guilty plea at any time before sentencing. He asserts that he could not have entered the plea voluntarily, knowingly, and intelligently while harboring this incorrect belief that he could withdraw the plea. The problem with Zapata's assertion is that it has no basis

20

in Kentucky jurisprudence. He would have us craft an entirely subjective rule out of whole cloth that would look solely at an individual defendant's assertions concerning what he believed when entering a plea. If we were to do so, every defendant would have grounds to withdraw his plea agreement simply by making an assertion that he did not properly understand some detail of the procedures employed once the plea was entered.

In Kentucky, RCr 8.10 states in pertinent part that "[a]t any time before judgment the court may permit the plea of guilty . . . to be withdrawn and a plea of not guilty substituted." However, the only language from RCr 8.10 contained in Zapata's motion to enter a guilty plea concerns Zapata's options in the event the trial court were to reject the plea agreement. The only circumstance the paperwork identified in which a plea could be withdrawn was if the trial court rejected the plea agreement. Here, the trial court accepted the plea agreement and that language is inapplicable. Given the contents of Zapata's signed plea agreement form taken as a whole, his alleged belief that he could withdraw his plea at any time before sentencing "no problem" was not reasonable.

We do not expect a trial court to disclose and discuss every possible consequence of a plea during a *Boykin* plea colloquy. That would be both impossible and impractical. Rather, "[t]he defendant need only be aware of the direct consequences of the plea . . . the trial court is under no constitutional obligation to inform the defendant of all the possible collateral consequences of

the plea." *Commonwealth v. Thompson*, 548 S.W.3d 881, 889 (Ky. 2018) (internal citations omitted).

Zapata stated during the *Boykin* colloquy that, among other things, he understood there would not be a trial, he would not be cross examining witnesses, he gave up the right to remain silent, and there would be no appeal. Zapata acknowledged he had read, reviewed, and signed the motion to enter a guilty plea which contained a list of his rights. It has long been the rule in this Commonwealth that acknowledging the written guilty plea form containing a defendant's rights is sufficient. "No cases are cited requiring a judge to read from the bench a defendant's rights to a defendant who has already waived those rights by written waiver, has acknowledged his signature thereto, and has further acknowledged that he understood those rights." *Commonwealth v. Crawford*, 789 S.W.2d 779, 780 (Ky. 1990). Although not lengthy (and, as noted, would have been improved by questions directed at Elleman concerning the plea and the Certificate of Counsel), the colloquy in this case was clear and unequivocal, and provided an opportunity for Zapata to ask questions.

Zapata testified on remand at the plea withdrawal hearing that Elleman told him he could withdraw his plea any time before sentencing, "no problem." Elleman testified she reviewed the motion to enter a guilty plea with Zapata and she did not tell Zapata that he could withdraw his guilty plea any time. The two testimonies are at odds with one other.

Elleman testified that if Zapata could withdraw the plea at any time as he claimed, then there would be no need to enter a plea. The trial court had

22

ample opportunity to observe both Zapata and Elleman at the plea colloquy and the remand hearing. The trial court clearly chose to believe Elleman and to disbelieve Zapata. "The trial court had an opportunity to see the witnesses and observe their demeanor on the stand, and recognition must be given to its superior position to judge their credibility and the weight to be given their testimony." *Kotas*, 565 S.W.2d at 447.

Pointing to discrepancies in Elleman's testimony, Zapata argues the trial court erred in believing her testimony rather than his. However, no matter how vigorous the disagreement, the trial court is tasked with sorting testimony and making decisions regarding credibility. The trial court had extensive experience with both Zapata and Elleman during the trial and was free to utilize those prior interactions in determining credibility.

Moreover, even though he was given the opportunity to ask questions of the court, Zapata did not ask about the possible withdrawal of his plea before sentencing. If Zapata had any doubts before, he should have known from the trial judge's comments at the *Boykin* hearing that the plea, if accepted, ended Zapata's case. The trial judge made statements such as, that he was "holding plea sheets indicating a resolution of the case," and asked Zapata if he "understood that a guilty plea is in lieu trial—meaning, takes the place of a trial, and if I accept this here in a few moments, the case is over and you cannot appeal this guilty plea." Zapata indicated that he understood that the case would be over if the trial court accepted his guilty plea. The trial court

23

and Elleman could not timely correct a misunderstanding of Kentucky law and procedure by Zapata if they did not know about it.

Elleman's testimony indicates she did not know Zapata was under the belief that he could withdraw his plea at any time. Zapata and Elleman, acting together as hybrid counsel, failed to bring Zapata's alleged belief to the attention of the trial court. If Zapata were to prevail on this claim, defendants could claim after a plea that they did not know or understand a rule of procedure, a statute, or a rule of evidence and—because they claim they did not know or understand—the plea must be set aside. It is reasonable to expect that if an issue is unclear to a defendant, he or she will either ask counsel or take advantage of the opportunity the court provides during the *Boykin* colloquy to ask questions and get the answer he or she needs. Zapata's answers to the trial court's questions in the *Boykin* colloquy in the context of the entire case belie his claim that he was under this mistaken belief regarding the ability to withdraw his plea. He acknowledged to the trial court that he understood that his case would be "over" if the court accepted the plea and Elleman testified that she had not told him that he could withdraw his plea at any time before sentencing.

In this case, the trial court found Zapata to be savvy and smart. The trial judge was in the best position to assess credibility. The trial court's findings of fact were not clearly erroneous and it did not err in denying Zapata's motion based on his alleged mistaken belief about the court's discretion in allowing him to withdraw his plea.

24

## B. The trial court did not abuse its discretion in denying Zapata's motion to withdraw his plea.

Zapata asserts the trial court erred when it failed to exercise its discretion under RCr 8.10 and set aside his guilty plea. In making this argument, Zapata restates his other arguments and then claims that even if the trial court properly found the plea was voluntary, the trial court should have exercised its discretion and allowed the plea to be withdrawn.

A plea may be withdrawn if the trial court, *in its discretion*, permits the withdrawal. "[T]he rule makes clear that the trial court *may* permit the defendant to withdraw even a valid plea. Under our rule, this latter decision is one addressed solely to the trial court's sound discretion." *Pridham*, 394 S.W.3d at 885. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (2000) (citing *Commonwealth v. English*, 993 S.W. 2d 941, 945 (1999)).

Zapata seeks to set aside his guilty plea based on either incorrect advice from his attorney or his own misunderstanding that he could withdraw his guilty plea at any time. He insists either of those reasons constitute a "fair and just reason." The "fair and just reason" language is found in the American Bar Association Criminal Justice Standards, R. 12-2.1(a) (1999) and in Federal Criminal Rules of Procedure 11(d)(2)(B). This is an attempt to create a new test, not found in the Commonwealth's Rules of Civil or Criminal Procedure or jurisprudence. In the Commonwealth, our Rules leave the withdrawal of a voluntary plea to the discretion of the trial court based upon the totality of the

25

circumstances in a case. We trust our trial courts in making those determinations and exercising their discretion.

In *Pridham*, 394 S.W.3d at 885, the Appellant asked this Court for such relief. There, we stated:

> Cox would have us read into the rule a right of withdrawal any time a defendant establishes "a fair and just reason" for it, provided that withdrawal would not unduly prejudice the Commonwealth, and he contends that his reason for wanting to withdraw his plea meets that standard. *Cf.* Fed. R.Crim. Proc. 11(d)(2)(B) ("A defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if: . . . the defendant can show a fair and just reason for requesting the withdrawal.").
>
> Cox did not present this claim to the trial court, and so it was not properly preserved for our review. We decline to address it, therefore, beyond observing that the denial of Cox's motion to withdraw his plea was not a palpable error so as to entitle Cox to relief under RCr 10.26.

*Id.*

More recently, the Court of Appeals took up this issue in *Blanton v. Commonwealth*, 516 S.W.3d 352, 356-57 (Ky. App. 2017). That court addressed the issue, stating:

> Blanton has requested that this Court apply the test for withdrawing a guilty plea under Federal Rules of Criminal Procedure 11(d)(2)(B) as set forth in *United States v. Hockenberry*, 730 F.3d 645 (6th Cir. 2013). That federal rule permits a defendant to withdraw his guilty plea if he "can show a fair and just reason for requesting the withdrawal." However, the Commonwealth points out that "[t]he precise terms of Rule 11 are not constitutionally applicable to the state courts." *Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir. 1975).

*Id.*

26

Assuming this issue was properly preserved below, we agree with the above-cited language in the Court of Appeals' *Blanton* decision and decline to change the standard for withdrawing guilty pleas in Kentucky. Our Rules of Criminal Procedure set out a different rule entrusting plea withdrawal to the discretion of the trial court. A whole body of case law has developed around this Rule and we will not upset that balance.

Zapata further claims the trial court erred because, under the totality of the circumstances, even without finding the guilty plea involuntary, the trial court abused its discretion. Zapata argues remand is mandated—and that upon remand this Court must order the trial court to allow Zapata to withdraw his guilty plea. We disagree.

"The essence of a discretionary power is that the person or persons exercising it may choose which of several courses will be followed." *Franklin Cnty, Ky. v. Malone*, 957 S.W.2d 195, 201 (Ky. 1997), *overruled on other grounds by Commonwealth v. Harris*, 59 S.W.3d 896 (Ky. 2001). As we noted above, the exercise of discretion to allow for withdrawing a guilty plea is held by the trial court. After review of the record in this case, we hold that the trial court did not abuse that discretion in declining to allow Zapata to withdraw his guilty plea.

## III. CONCLUSION

After careful review of the issues, we affirm the trial court's denial of Zapata's motion to withdraw his guilty plea.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Joseph V. Aprile II
Lynch, Cox, Gilman & Goodman, P.S.C.

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General

Kenneth Wayne Riggs
Assistant Attorney General